## PERFECT TAILBOARDS, PATENTED, v. NATIONAL BENT STEEL CORPORATION et al.

### No. 166.

District Court, E. D. New York.
May 5, 1939.

Brown & Jones, of New York City (Donald L. Brown, of New York City, of counsel), for plaintiff.

Frederick A. Wiehl, of New York City, for defendants.

GALSTON, District Judge.

This is a patent suit in which contributory infringement is alleged against both defendants of letters patent no. 1,695,609, issued to Frank Richter on December 18, 1928, for an improvement in tail-boards and tail-board mounting for trucks.

This patent has been before this court in other actions. On May 12, 1933, plaintiff brought suit for infringement against Schenck Auto Body Corporation, and L. Bernstein, and a default decree was entered; also suit was brought on December 31, 1935, against the Colonial Body Corporation, and in that case, after final hearing, the patent was held valid and infringed. A third suit was brought, this time against Biltwell Auto Body Co., Inc., Perfect Tailboards, Patented, v. Biltwell Auto Body Co., Inc., 25 F.Supp. 930, and again Judge Campbell, after final hearing, held the patent valid and infringed.

The defendants filed separate answers which are similar, wherein they assert invalidity and deny infringement. No

prior art is alleged in either answer. Nevertheless at the trial prior uses of A. Litman Iron Works, the Consolidated Edison Company and Adam Black & Sons, Inc., were sought to be proved.

Infringement is alleged of Claims 1, 2 and 4, which were relied on and sustained in the action against the Biltwell Auto Body Co., Inc.

The patent discloses a tail-board and a tail-board mounting for trucks in which the mounting constitutes both a hinge for the tail-board and a bumper or protective device for the truck. For one of its objects the inventor sought to bring about a substantially flush surface at the connection between the tail-board and the end of the truck when the tail-board is lowered to permit loading of the truck. An important feature is the construction provided whereby the hinge-bar functions as a bumper. Other objects are set forth in the specifications which flow from the particular construction disclosed.

Briefly stated the preferred embodiment of the invention shows the floor of the truck at the rear edge provided with a metallic U-shaped bar, fastened thereto by means of screws, and comprising a looped knuckle portion extending outwardly beyond the edge of the end of the truck, and of a thickness substantially equal to the thickness of the floor and having an upper flange imbedded in the upper surface of the floor and a lower flange engaging and imbedded in the bottom surface of the floor. This bar extends a sufficient distance beyond the edge of the floor to provide space for a pivot, and at suitable places it is provided with a series of notches so as to cause the loop portion of the bar to form a series of projecting hinged knuckles into the notches between which a series of cooperating looped knuckles extend. These cooperating knuckles are formed at the end of U-shaped straps which engage the upper and lower surfaces of the tail-board of the truck.

The knuckle joints are inserted within the notches of the aforesaid bar and then a pipe or rod is passed through the knuckles so that it becomes a pivot about which the knuckles swing about the end of the truck. Other details of construction are described minutely in the specification but reference thereto will not be necessary in the discussion of this suit.

Claims 1, 2 and 4 of the patent were alleged to be infringed. It will be suffi-cient to quote Claim 1: "1. A tail-board and tail-board mounting embodying, in combination, a hinge member fastened at the edge of the tail of a truck and engaging upper and lower surfaces thereof, and another hinge member mounted at the edge of the tail-board and likewise engaging opposite surfaces thereof, one of such hinge members being provided with knuckles and a notch between such knuckles and the other member having a projecting knuckle fitting within said notch, and a pivot member extending across said notch and within the knuckles to connect the two members together and to provide a close and strong connection between the edge of the truck and the adjacent edge of the tail-board, the hinge member secured to the edge of the tail of the truck extending beyond the face of the tail-board when in vertical position to thereby constitute a bumper or protective means for the truck and tail-board."

On its face the invention and the claims seem to be of narrow scope but in neither of the cases tried before Judge Campbell, nor in this case, has any prior patent or printed publication describing such a structure been offered. In the only prior use considered by Judge Campbell in Perfect Tailboards, Patented, v. Biltwell Auto Body Co., Inc., D.C., 25 F.Supp. 930, he commented on the failure of the defendant to produce any contemporaneous writings or physical exhibits, and found that the evidence fell short of that required to establish prior use.

Thus the presumption of validity which the patent enjoyed when issued has persisted.

The plaintiff offered the file wrapper and it appears that the claims in suit were allowed substantially in the form in which they were submitted.

The defendants in this case are charged with making and selling to the Biltwell Auto Body Co., Inc., and to others the U-shaped plate corresponding to the element 3 of the patented combination with the knowledge that such plate was adapted for use and intended to be used and was actually used in the manufacture of tail-board mountings in infringement of the patent in suit. The specific act of infringement complained of is the sale of defendants' plate in evidence to Lenko on or about November 30, 1938. Alexander Litman, the defendant, admitted having

made the plate and that he delivered it to the National Bent Steel Corporation, his codefendant. A comparison of the exhibit with the structure of the patent in suit shows it is substantially like element 3 of the patent. Moreover the order given by Lenko was for one U-shaped plate with notches for moving-van type body or tail-board. It is true that the invoice covering the sale by the National Bent Steel Corporation refers only to "Your order for 1 #10 ga bent plate 7″ 6¾″ width with 4—1¾″ notches." It is unfortunate that a copy of the order does not appear in the record but it is fairly inferable, and I do so find, that the defendants knew for what purpose the plate with its notches was to be employed. There was no witness who could testify that this plate in evidence in the form in which it was made and sold could be used for anything except the tail-board truck construction. Also as bearing on the question of knowledge, there is the admission by Litman that plates similar to that in evidence were sold by the defendants to truck body builders with the intent that they were to be used in connection with the manufacture of tail-board mountings. Mitchell, who was in the business of building commercial truck bodies, purchased from the defendant, the National Bent Steel Corporation, over a period of two and a half years prior to the date of the trial, plates like that of plaintiff's Exhibit 7. This witness referred to conversations that he had with the individual defendant Litman and his son who is president of the corporate defendant. Those conversations related to Mitchell's inquiry concerning the patent situation. Litman told him: "There is no patent, it is only on some—on the actual board there is no patent, and if there is any trouble you can fall back on me. I assure you there is no such thing as a patent." Mitchell said that the Litmans knew that the plates were to be used as part of the hinge for the tail-board.

Likewise knowledge connecting the defendants with the proposed use of bars such as Exhibit 7 flows from the dealings of the defendants with the Biltwell Auto Body Co. The photographs marked "Plaintiff's Exhibit 3" show the truck body and tail-board portions found by Judge Campbell to have infringed the claims in suit herein in the case brought on this same patent against the Biltwell Auto Body Co. U-shaped plates such as is shown in these photographs, fastened to the floor of the truck body and extending out beyond the body, were purchased by the Biltwell Auto Body Co. from the National Bent Steel Corporation over a period of three or four years. In fact the entire supply of the Biltwell Company was purchased from the defendant corporation. Those plates were always used for auto bodies and were purchased for no other purpose. Brown, the secretary of the company, admitted that when those plates were purchased they did not have the notches therein but that bent plates were ordered with dimensions given; but in answer to a question put by defendants' counsel, "And for what other purpose could a bent plate such as delivered to you by the National be used on a truck?" Brown answered, "On no other but the tail-board." He also said that he believed it was a matter of common knowledge as to what such bent plates were used for. Since in my judgment both defendants sold element 3 of the patent with the knowledge that it was to be used as an element of the combinations defined in the three claims in suit, they were guilty of contributory infringement. Westinghouse Electric & Mfg. Co. v. Precise Mfg. Corp., 2 Cir., 11 F.2d 209; Electro Bleaching Gas Co. v. Paradon Engineering Co., 2 Cir., 12 F.2d 511; Parsons Non-Skid Co. v. Atlas Chain Co., 2 Cir., 198 F. 399; Individual Drinking Cup Co. v. Errett, 2 Cir., 297 F. 733.

There remains for consideration the defense of invalidity based on the alleged prior uses.

The witness Coxe, associated with the Consolidated Edison Company of New York City, testified that prior to 1924 that company manufactured its own car bodies. He said that on all such truck bodies with a tail-gate closed or opened, they use a bent plate on the rear, some to accommodate skids, and under the tail-board. From 1925 they have always used some type of the bent plate on the tail. Rather vaguely one of these types was described by the witness. He referred to an eye that was fastened to the tail-board and notches cut either in the angle or in the circular plate "and a rod or pipe of any dimension we might wish to use was inserted in there as a hinge". The sketch B which the witness made certainly is far removed from the structure defined in the patent in suit. There was no model offered, no specimen of the plate described as having been used over a period of

many years; and no contemporaneous writings or prints of any kind were produced by the witnesses. Such testimony cannot be accepted as proof of a prior use under the well established authority that holds that prior use must be established by evidence, as convincing as that required to establish guilt in a criminal cause.

Another use referred to by the defendant was that of Adam Black & Sons, Inc. This corporation builds truck bodies. The witness, Fred Black, connected with the corporation, testified that he had made tail-gates for Richter, the inventor of the patent in suit, somewhere in between 1924 and 1925, and that such plates consisted of a U plate and a strap hinge. In 1925 he made one of these tail-gates for one Rein and for the Fennel Furniture Company. He described the tail-gate made for Richter as being a "round pressed channel for the body frame" and said that he used two 3/16" strap hinges to fasten the tail-board to the top of the cross bar on the tail end of the body. He described the U plate as "a plate, 6 by 6 by the thickness of the body frame, which happens to be 2 inches" and bent top and bottom to form a U to reinforce the tail-board of the body frame proper. He made a sketch while on the stand of a tail-gate hinge that he had made for Richter fourteen years before. Richter, on the other hand, testified that what Black had done was on Richter's specification, on orders given in late 1926 or early 1927. The weight of the evidence as to the Black use is most unconvincing and certainly falls far short of that required under the authorities. Black failed to produce records, original devices or invoices; in addition to which it is not at all clear that what he did for Richter was not on Richter's own specifications. Certainly evidence of this kind cannot be used to overcome the validity of a patent.

One Rudolph Ario, an iron worker and body-builder, was called by the defendant. This man said he was an independent worker but the pleadings set forth no prior use nor even at the trial was there an amendment offered. However, he was permitted to testify as to his knowledge of the prior art and he did say that Litman had done work for him "bending sections for metal bodies." His testimony can be wholly disregarded because he testified that his first work was done only two or three years before the trial which began on February 24, 1939, whereas the patent in suit issued December 18th, 1928.

Thus we are brought finally to the alleged prior use of the defendants. Alexander Litman testified that he did some work for Ario in 1920, though Ario, as has just been noted, when called by the defendants said it was only two or three years ago that the work was done. The witness identified some blue-prints of early constructions of bent plates but he could not produce the tracings. The blue-prints bear the date November 10, 1919.

Van Syckle, defendants' witness, testified that he had been associated with Alexander Litman from 1920 for approximately four years as a salesman. He said that Litman made hinges, posts, stringers and risers. When shown defendants'. Exhibit J (the blue-prints) he said that: "It seems to me I have seen them before" but his recollection was not definite; "Well I wouldn't say that—no. I don't know as I have seen just these."

Sarcona, another iron worker, worked for Litman from 1917 to 1931. He remembered making the style of hinge marked A–1 of Exhibit J. He said that this type of hinge was used for cellar doors in 1920, 1921, etc. He said he might have made the style B–2 but wasn't sure of it. He made the style Exhibit H, which is similar to A–1.

Litman spoke of an invisible hinge that he manufactured for use on cellar doors as early as 1906 when he first started in business, and in an examination that proceeded along disconnected topics he later said that he has been making hinges since 1909—various types. This hinge he described as "of a plate that sets up and fastens down to the back of the truck". He produced a type of tail-board hinge, Exhibit E, a U-shaped plate with a piece of pipe and a strap for adjustment, which he said he commenced manufacturing some time around 1920 or 1921. Exhibit F, another style, and Exhibit G were made about the same time. He gave different style numbers to these hinges. Exhibit F was designated B–1. Style A–2, with the exception of the off-set, related to Exhibit E. A–1 was the style number designated for Exhibit H.

There is no explanation offered as to how the several Litman prior use hinges could be used effectively as an element in the structure defined in the claims of

554

the patent in suit to meet the various objects described in the specification of the patent; nor indeed is there any proof that they were ever so used.

On cross-examination Litman admitted that the blue-prints which he produced had been made only a year and a half ago from the tracing. He said that he had made bent plates for uses other than hinges on car bodies, but admitted, incidentally, that when he sold hinge-plates he knew for what they were being used.

Kubelka testified that he made the original tracings of which the blue-prints are a copy. This witness said that the model, Exhibit E, he has known in general iron working practice since 1921. He designed it for Litman but he doesn't know that it was ever put on a tail-board. He had nothing to do with the manufacture of the hinges, plates or tail-board constructions. He merely made the sketches.

It has been remarked that the original tracings of the blue-prints, Exhibit J, were not produced. It is true that duplicate bills were offered which refer to some of the types of Exhibit J, but none of the purchasers was called for corroboration, nor were any of the sketches, drawings and circulars produced to which Litman referred in his testimony. Troy v. Hakin Bros.-Kassar Co., D.C., 8 F.Supp. 1018. Corroboration given by independent, disinterested witnesses would have had great persuasive value.

Even the date of manufacture of the models is kept in doubt. Litman testified that Exhibit F, the model, was made two weeks ago; Exhibit E, six or seven years ago; Exhibit G in 1930 or 1931; Exhibit H, "as I said, many years ago, I don't know off hand when it was. I don't remember. They were old models that we had laying down there."

Despite the caution that Judge Campbell pointed out in his opinion in the Biltwell case, supra, in respect to the weight of evidence required to establish prior uses, these defendants seem not to have profited, for the quality of proof offered in respect to the three prior uses discussed hereinbefore fails to meet the test defined in the cases. The Barbed Wire Patent, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; Deering v. Winona Harvester Works, 155 U.S. 286, 15 S.Ct. 118, 39 L.Ed. 153; Block v. Nathan Anklet Support Co., Inc., 2 Cir., 9 F.2d 311; Troy et al. v. Hakin Bros.-Kassar Co., Inc., D.C., 8 F.Supp. 1018.

The plaintiff may have a decree in accordance with this opinion. If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.